DECISION
Before this Court is Plaintiffs', Unisys Corporation and First Union National Bank, motion for summary judgment and Defendant Rhode Island Life and Health Insurance Guaranty Association's cross-motion for summary judgment. Opposing parties have timely filed objections to each respective motion.
 Facts/Travel
Unisys Corporation (Unisys) provides its employees with an opportunity to participate in a retirement plan entitled Unisys Savings Plan (Plan).[1] Employees who choose to participate in the Plan elect from one or more of six different types of investment funds into which the participants could direct their money. Among these investment options are the Fixed Income Fund and the Insurance Contract Fund, which invested primarily in group annuity contracts issued by insurance companies. Participants authorize Unisys to deduct from his or her paycheck a designated percentage of his or her income on a pre-tax basis.[2] Under the Plan, participants determine their preferred level of investment and are permitted to transfer money between funds. The Plan allows participants to withdraw funds from his or her account upon termination of employment or death. The Plan further provides for the distribution of account balances to a beneficiary in the event of the death of a participant. Each participant maintains a separate account which is adjusted at the end of each month based on the fair market value of the assets of the Plans.
With the retirement savings of Unisys employees who were participating in the Plan, four contracts[3] were purchased in 1987 and 1988 from an insurance company called Executive Life.[4] These contracts were issued to Northern Trust Company, then the Trustee for the Unisys Plan.[5]
First Union National Bank, (First Union) the current Trustee, holds the contracts in trust for the exclusive benefit of the plan participants. Under the contracts, Unisys was obligated to deposit an agreed upon premium with Executive Life. This premium was funded by employee contributions to the Unisys Plan. Executive Life was obligated to credit interest at the guaranteed rate to the "fund value"[6], to fund withdrawals requested by the Trustee for the Plan and, upon maturity of the contracts, to pay the fund value plus the guaranteed rate of interest to the Trustee. The Executive Life contracts also provided an option for the employee to elect to authorize Unisys to direct Executive Life to use a portion of the contract funds to purchase an annuity for the employee. Should this option be exercised, Executive Life would issue the annuity to the employee, and would be obligated to provide benefits to the employee or his or her beneficiary under that separate annuity contract.
On April 11, 1991, the California Commissioner of Insurance placed Executive Life in conservatorship. On April 12, 1991, the Commissioner ordered all payments and withdrawals from Executive Life suspended. Accordingly, Unisys suspended all transactions on that portion of the Fixed Income Fund and the Insurance Contract Fund that was represented by the Executive Life contracts. Additionally, Unisys "froze" the part of each employee's retirement account that was invested in the Executive Life contracts. Consequently, employees were not able to make withdrawals on the "frozen" portion of their retirement account.
On December 6, 1991, Executive Life was declared insolvent and ordered liquidated by a California Superior Court. At that time, 134 employees of Unisys who were Rhode Island residents were participating in the Plan. These participants had $484, 133 invested in the four Executive Life contracts.
From September of 1993 through November of 1999, the Trustee of the Unisys Plan received periodic payments from the Executive Life estate. These payments were distributed to each employee with a frozen account, including the 134 participants who were Rhode Island residents. However, these payments were not enough to satisfy the account balances owed to these participants, nor were these payments any satisfaction of the interest owed under the Executive Life contracts since 1991.
In an attempt to satisfy the amounts owed to Unisys participants, Unisys submitted a claim to the Rhode Island Life and Health Insurance Guaranty Association (RILHIGA). RILHIGA is an unincorporated association created by the Rhode Island Life and Health Insurance Guaranty Association Act (the Act).[7] R.I.G.L. §§ 27-34.1-1 et seq. Section 27-34.1.-2 of the enabling statute reads:
 "Association of insurers. — To provide protection for policyholders, the insured, beneficiaries, annuitants, payees, and assignees of life insurance policies, health insurance policies, annuity contracts, and supplemental contracts, subject to certain limitations, against the failure in the performance of contractual obligations due to the impairment or insolvency of the insurer issuing the policies or contracts, an association of insurers is created to enable the guaranty of payment of benefits and of continuance of coverage. Members of the association are subject to assessment to provide funds within a reasonable amount of time to carry out the purpose of this chapter and the association is authorized to assist the commissioner, in the prescribed manner, in the detection and prevention of insurer impairments or insolvencies."
RILHIGA denied the claim submitted by Unisys and has never paid any of the Rhode Island resident participants for any claims based on losses resulting from the insolvency of Executive Life. Subsequently, Plaintiffs Unisys Corporation and First Union National Bank in its capacity as Trustee of the Unisys Savings Thrift Trust brought this action to obtain declaratory and equitable relief and damages, requiring RILHIGA to pay the claims of Unisys Plan participants resident in Rhode Island. The Plaintiffs have filed a timely motion for summary judgment. Likewise, the Defendant has filed a timely cross-motion for summary judgment.
Unisys and First National, as Plaintiffs, advance a number of arguments in support of its summary judgment motion. The most significant argument is that since the contracts at issue are annuity contracts covered under the Rhode Island Life and Health Insurance Guaranty Association Act, RILHIGA is obligated under the Act to pay Executive Life's contractual obligations that are owed to Unisys Plan participants resident in Rhode Island who are the beneficial and equitable owners of the Executive Life contracts. Accordingly, the Plaintiffs argue that this Court should enter judgment in favor of Plaintiffs and against Defendant in the amount of $555, 803, including interest at the contract rate on the unpaid balance through maturity and at the statutory rate of 12% per annum thereafter through March 31, 2002 and such additional amounts as continue to accrue at the statutory rate of 12% per annum until entry of judgment. Plaintiffs also request an award of post judgment interest at the rate of 12%, pursuant to R.I.G.L. § 9-21-10, on the entire amount of the judgment, and such other amounts, including costs and attorneys' fees as the Court may deem appropriate to award.[8]
The Defendant, RILHIGA, on the other hand, maintains that summary judgment should be denied as to the Plaintiffs' motion, and granted as to its own motion. The Defendant also advances a variety of arguments which may be reduced to one common theme. Mirroring the Plaintiffs' view, albeit in the opposite vein, the Defendant contends that the contracts at issue are not annuity contracts covered under the Act, since the Unisys Plan participants resident in Rhode Island are not the legal owners of the Plan, are not the parties to whom contractual obligations are owed, and are not entitled to coverage under the Act. In the alternative, the Defendant argues that because the contracts at issue are considered "unallocated annuity contracts", as opposed to annuity contracts that are allocated, these contracts are afforded no coverage under the Act. Accordingly, the Defendant asserts this Court should enter summary judgment in its favor declaring that the Plan participants are not entitled to Guaranty Act coverage for the four Executive Life guaranteed investment contracts.
 Standard of Review
Super. R. Civ. P. 56 empowers a trial justice, upon proper motion, to enter summary judgment in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus in a proceeding for summary judgment, the court must "examine the pleadings and affidavits in the light most favorable to the nonmoving party to decide whether an issue of material fact exist[s] and whether the moving party [is] entitled to summary judgment as a matter of law." Buonnanno v. Colmar Belting Co., Inc., 733 A.2d 712, 715 (R.I. 1999) (citing Textron, Inc. v. Aetna Casualty and Surety Co., 638 A.2d 537, 539 (R.I. 1994)). The party opposing a motion for summary judgment may not merely rely upon mere allegations or denials in his or her pleadings. Small Business Loan Fund v. Loft, 734 A.2d 953, 955 (R.I. 1998) (citing Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (RI. 1998)). Rather, "[a] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material fact and cannot rest on the allegations or denials in the pleadings or the conclusions or on legal opinions." Macera Brothers ofCranston, Inc. v. Gelfuso Lachut, Inc., 740 A.2d 1262, 1264 (RI. 1999) (citing Manning Auto Parts, Inc. v. Souza, 591 A.2d 34, 35 (R.I. 1991)). If the opposing party cannot establish the existence of a genuine issue of material fact, summary judgment must be granted. Grande v.Almac's, Inc., 623 A.2d 971, 972 (R.I. 1993).
 Annuity Contracts
The Rhode Island Lfe and Health Insurance Guaranty Act
The Plaintiffs maintain that the Executive Life contracts are annuity contracts and, therefore, are "covered contracts," within the scope of the Act. The Plaintiffs make this assertion because, as they point out, the Rhode Island Life and Health Insurance Guaranty Act expressly provides for coverage as to annuity contracts. By way of example, the Plaintiffs direct the Court to several sections of the Act which evidence their position. In particular, § 27-34.1-2 states that the Act shall "provide protection for policyholders . . . of. . . annuity contracts . . . ." R.I.G.L. § 27-34.1-2. The Defendant does not dispute that the Act in fact covers annuity contracts, thereby obviating any issue on this point.
The Act, in the section entitled "Applicability", goes on to draw explicit distinctions as to who shall be provided coverage under the policies and contracts and who is excluded from coverage. R.I.G.L. § 27-34.1-3. Among others who are included under the Act are, "Persons who are owners of the policies or contracts or are insureds or annuitants under the policies or contracts and who are Residents of the state." R.I.G.L. § 27-34.1-3 (a)(2)(i). Section 27-34.1-5 defines "Resident" as "any person who resides in the state at the time a member insurer is determined to be an insolvent insurer and to whom contractual obligations are owed." R.I.G.L. § 27-34.1-5 (10).
Both Plaintiffs and Defendant agree on two of the four elements contained in §§ 27-34.1-3 and 27-34.1-5. First, Plaintiffs and Defendant agree that the 134 Unisys Plan participants were in fact persons who resided in the state of Rhode Island at the time Executive Life was declared insolvent. The second area of agreement is that Executive Life was a member insurer determined to be an insolvent insurer. Major disputes, however, arise as to whether or not the 134 Unisys Plan participants were "Resident[s] to whom contractual obligations are owed" as defined in R.I.G.L. § 27-34.1-5 (10) and whether these participants "owned" the contract as referred to in R.I.G.L. § 27-34.1| 3(a)(2)(i).
Contract Rights in Beneficial and Equitable Ownership
The central issue before this Court, then, is whether the 134 Unisys Plan participants are "owners" of the contracts "to whom contractual obligations are owed [,]" by Executive Life. The Defendant contends that the answer is no. In support thereof, Defendant RILHIGA cites the language in the Executive Life contracts which states that the trustee designated by Unisys is the "owner of the contract." (Def.'s Mem. of Law Ex. 11). RILHIGA argues that only when an individual contract was purchased did the participant have a contract with Executive Life and only then did Executive Life owe any contractual obligation to him or her which would be protected by the Act. The Defendant maintains that any such obligations, if created, had nothing at all to do with obligations to the designated owner of the contract, the Trustee. Furthermore, RILHIGA asserts, not only is there no evidence before this Court that any such individual contract was purchased, but the only contracts at issue are the ones for which First National Bank is the named Trustee and owner. Therefore, contends RILHIGA, the 134 Unisys Plan participants cannot possibly be the owners of the contracts. Accordingly, argues the Defendant, the Act is inapplicable to the Unisys Plan participants.
The Plaintiffs, on the other hand, offer the Court an entirely different view of ownership and contract rights. To begin with, the Plaintiffs point out that the Act itself does not define the term "owner." While the Plaintiffs concede that the Trustee may be the "legal owner" of the contracts, the Unisys Plan participants are the "equitable" or "beneficial" owners of the contracts, and from this ownership contractual rights flow. In support of this position, the Plaintiffs first discuss the mechanics of the contract itself. For example, the Plaintiffs note that the money invested in the Plan was a product of the individual choice of the employee-plan participant. Moreover, aver the Plaintiffs, the participant chose how much money would be deducted from his or her paycheck and then decided into which fund this money would be invested. The Plaintiffs additionally point out that the participants, not the Trustee, are liable for tax payments upon the withdrawal of funds from his or her account.[9] Furthermore, the Plaintiffs argue, only the participant gains from or suffers a loss in connection with the investments he or she selects. Also, the Plaintiffs recommend that the Court pay particular attention to the fact that each participant has a separate account for which he or she receives a statement containing information including the value of the retirement account. Taking the sum of the mechanics into consideration, the Plaintiffs contend that this Court should find that the participants are equitable or beneficial "owners" of the money invested in the Executive Life policies.
In further support of this ownership theory, the Plaintiffs aver that courts in Pennsylvania, Indiana, Arizona and Nebraska have dealt with this very issue and held that the individual participants were in fact beneficial or equitable owners of the contracts covered under a similar life and health insurance guaranty act. In each of these cases, there are great similarities between the contracts at issue as compared with those in the instant matter. In fact, the Pennsylvania and Nebraska cases concern the very same type of Executive Life contracts as in the matter at hand, since these cases are two of many suits Unisys brought in various states in its attempt to recover losses suffered by plan participants due to the insolvency of Executive Life. Additionally, in both the Arizona and Indiana cases, the corporate retirement "plans" are virtually identical to the Unisys plan in the instant matter and the Executive Life contracts purchased by the Arizona and Indiana participants are of the same type as the contracts in the instant matter. Moreover, there are great similarities between each of the various state life and health insurance guaranty acts as compared with the Rhode Island Life and Health Insurance Guaranty Act. Therefore, this Court finds an examination of these cases instructive.
In 1995, Pennsylvania became the first court to decide that contracts issued by Executive Life are annuities covered under a Life and Health Insurance Guaranty Act. Unisys Corp. v. Pennsylvania Life HealthIns. Guaranty Ass'n, 667 A.2d 1199 (Pa. Cmwlth. 1995). In Unisys, the corporation sought to recover from the Pennsylvania Life and Health Insurance Guaranty Association (PLHIGA) on behalf of Unisys employees who had invested retirement savings in Executive Life contracts. PLHIGA denied coverage, asserting that the contracts at issue were not "annuity contracts" under the Pennsylvania Life and Health Insurance Guaranty Act. Id. at 1201-03. Unisys moved for summary judgment and the court granted Unisys' motion with respect to plan participants who were residents of Pennsylvania at the time Executive Life was declared insolvent.[10] Id. at 1204-05. In reaching its conclusion, the court referred to specific language in the Pennsylvania Life and Health Insurance Guaranty Act, noting, "the purpose of the 1978 Act is to protect policyholders, beneficiaries and annuitants of annuity contracts against the failure of an insurer to perform its contractual obligations because of insolvency." Id. at 1204. With the Act as its platform, the court then engaged in a discussion of the concept of beneficial or equitable ownership in connection with contract ownership. Id. at 1204-05. Specifically, the court found,
 "[the] Trustee is in charge of the proceeds of these Contracts and holds those proceeds in trust for the exclusive benefit of the resident participants under the Plans. . . resident participants are the equitable owners of the Contracts which are held in trust for their benefit. . . resident participants meet the statutory requirements of Section. . . of the 1978 Act [.]"
Id. With the question of ownership decided, the PLHIGA was required to provide coverage to the plan participants, as to the Executive Life contracts. Id. This case was subsequently affirmed by the Pennsylvania Supreme Court. Unisys Corporation v. Pennsylvania Life and HealthInsurance Guaranty Association, 684 A.2d 546 (Pa. 1996).
Two years later, the Arizona Supreme Court utilized the concept of "beneficial or equitable ownership" to bear out the intent of a legislative act. Arizona Life Disability Insurance Guaranty Fundv. Honeywell, Inc., 945 P.2d 805 (Ariz. 1997). In Honeywell, Respondent Corporation Honeywell, Inc. provided retirement plan options to its employees who chose to participate. Id. These contracts were purchased from Executive Life and issued to the trustee of Honeywell's retirement plan. Id. When Executive Life was declared insolvent, the Honeywell trustee submitted a claim to the Arizona Life and Disability Insurance Guaranty Fund (Fund) to cover the retirement plan's losses. Id. The Fund denied coverage and instead sought a declaratory judgment that Arizona law excluded these contracts from coverage. Id. In denying coverage, the Fund argued that because the Executive Life contracts were issued to a non-resident trustee, and not directly to individual Arizona resident plan participants, the contracts were thus excluded from Fund coverage.Id. at 816. The trial court entered summary judgment for Honeywell's trustee. Id. Division One of the Arizona Court of Appeals subsequently reversed. Id. The Arizona Supreme Court, in holding that the Arizona resident plan participants were the equitable owners of the contracts and that this ownership satisfied the purposes of the Arizona guaranty act, relied on the purpose of the statute. Id. To hold otherwise, the Honeywell court declared, "would lead to a perverse result, where pension plan participants would bear the very losses of insolvency the Act was established to prevent. We hold that the Legislature could not have intended this result." Id. The court opined that "the Fund's interpretation of the statute would lead to unreasonable consequences contrary to the purposes behind the guaranty act." Id. In fact, theHoneywell court warned that if it were to adopt the reasoning of the Fund, employees who are residents of other states could invoke the protection of Arizona's fund merely because an Arizona resident was trustee of their retirement plan. Id. The court went on to caution that the Fund would then be exposed to coverage of benefits owed to unknown numbers of non-Arizonans, based merely on the selection of an Arizonan as trustee. Id. Moreover, under the Fund's proposed construction, Arizona employees would be denied coverage merely because their trustee was not a resident of the state. Id. The Honeywell court concluded, "The purpose of Arizona's guaranty act was to protect individual participants of annuity contracts, among others, from insurance company insolvency. The Fund's argument seems to us patently and unnecessarily contrary to this policy."Id. at 817. The Fund then was required to provide coverage to the Honeywell plan participants, the beneficial and equitable owners of the contracts, who suffered losses as a result of the insolvency of Executive Life.
Later that year, the Indiana court adopted the reasoning of the Pennsylvania and Arizona courts in holding that the plan participants are the beneficial or equitable owners of the contracts held in trust for their benefit, and resident plan participants are "residents" to whom contractual obligations are owed under the Indiana guaranty act. Bennettv. Indiana Life and Health Insurance Guaranty Association, 688 N.E.2d 171
(Ind. Ct. App. 1997). In Bennett, two corporations, Inland and Haynes, provided retirement plan investment options to their respective employees. Each company had a retirement plan trustee, who, in 1988, purchased guaranteed investment contracts from Executive Life. Id. When Executive Life was declared insolvent, the trustees looked to the Indiana Life and Health Insurance Guaranty Association Law for coverage for losses sustained by Inland and Haynes plan participants. Id. The Indiana Life and Health Insurance Guaranty Association initially advised the corporations that since the trustees were the "owners" of the policies under the guaranty act, the residency of the trustees would be the determinative factor. Id. According to the Association, since the trustee for Inland was a resident of Indiana, policies under him would be covered under the Act. Conversely, since the trustee for Haynes was not a resident of Indiana, policies under him would not be subject to the protection of the guaranty act. Id. Both Inland and Haynes subsequently requested a hearing with the Commissioner of Insurance to determine the Association's duties under the Act. Id. The Commissioner issued a "Memorandum of Decision, Findings of Fact, Conclusions of Law, and Order" granting the summary judgment motions filed by Inland and Haynes and denying the motion filed by the Association. Id. at 175. In issuing his order, the Commissioner discussed the purpose of the Act, to protect Indiana residents under insurance contracts of an insolvent insurer. Id.
Subsequent to the Association filing a petition for judicial review of the Commissioner's order, the trial court reversed and vacated the order of the Commissioner. Id. In the Court of Appeals, the Bennett court ultimately agreed with both the Unisys and Honeywell courts that a trustee of a plan holds the proceeds of the plan in trust for the exclusive benefit of the plan participants. Id. at 178. The court went further in stating that the argument advanced here by the Association is the same argument that has been rejected by both the Unisys andHoneywell courts. Id. at 177. While the Bennett court acknowledges that the Indiana legislature did not explicitly state the purpose of the guaranty act, the drafters of the 1975 National Association of Commissioners' Model Act which formed the basis for the Indiana act did so. Id. at 178. Specifically, "In the Official comments to the 1975 Model Act, the drafters state that the basic purpose of a guaranty fund "is to protect policy-owners, insureds, beneficiaries, annuitant payees, and assignees against losses which might otherwise occur due to an impairment or insolvency of an insurer."' Id. To interpret the Act otherwise, theBennett court concludes, would be "contrary to the statute's purpose."Id.
Most recently, in August of 2002, the Nebraska court followed the reasoning of the Pennsylvania, Arizona and Indiana courts in finding that the relevant Life and Health Insurance Guaranty Act should be liberally construed so as to cover the Executive Life contracts that First Union Bank held as trustee, and that Unisys plan participants held as "beneficial and equitable owners." Unisys Corporation v. Nebraska Lifeand Health Insurance Guaranty Association, LANCASTER COUNTY DISTRICT COURT, Docket 526, Page 157. In Nebraska Life, the court examined a set of facts virtually identical to both the facts before the Pennsylvania court as well as facts in the instant matter. The Nebraska court borrowed generously from the Pennsylvania decision, as well as from the Arizona and Indiana decisions in applying the concept of equitable or beneficial ownership. In interpreting the Nebraska Life and Health Insurance Guaranty Act, the Nebraska Life court concluded, "The Act is to be construed in a fair and reasonable manner that is consistent with and intended to achieve the purposes for which the Act was enacted." Id.
In summarily dismissing the equitable or beneficial ownership claim by the Plaintiffs, RILHIGA refers this Court to Georgia, Illinois, Michigan, and Texas courts which the Defendant avers have rejected the equitable or beneficial owner theory as flawed. See Georgia Life Health Insurance Guaranty Association v. Gilman Paper Company DeferredCompensation Savings and Investment Plan, 549 S.E.2d 751 (2001); DynamicSystems, Inc. v. Boozell, 726 N.E.2d 1156 (2000); Unisys Corporation v.Commissioner of Insurance, 601 N.W.2d 155 (1999); Unisys Corporation v.Texas Life, Accident, Health Hospital Service Insurance GuarantyAssociation, 943 S.W.2d 133 (Tex. App. 1997). As the Plaintiff correctly points out, however, the courts in each of these cases were interpreting statutes that are materially different from the Rhode Island Act. The critical distinction is that in the Defendant's cases, legislatures in all four jurisdictions had reenacted its respective statute with a provision that specifically defined "unallocated annuity contract." This provision also limited coverage for such contracts to resident "contract holders" as opposed to "owners." This provision was operative at the time that the insurance company was declared insolvent. These four courts were construing statutes that contained a provision that neither Rhode Island, nor the Pennsylvania, Arizona, Indiana or Nebraska statutes contained. These cases are entirely distinguishable and the rationale therein that the Defendant seeks to rely on is unavailing.
The concept of "beneficial or equitable" ownership is not foreign to Rhode Island jurisprudence. In fact, our Supreme Court has applied this doctrine to hold that even though a corporation held legal title to policies, "decedent still retained incidents of ownership" sufficient to include life insurance proceeds in his estate. Estate of Dodenhoff v.Clark, 572 A.2d 1326, 1329 (1990). In explaining, the Dodenhoff court quoted from a related federal appellate case from the First Circuit Court of Appeals. United States v. Rhode Island Hospital Trust Co., 355 F.2d 7
(1st Cir. 1966). "The very phrase "incidents of ownership' connotes something partial, minor, or even fractional in its scope. Power can be and is exercised by one possessed of less than complete legal and equitable title." Id. at 10. Similarly, in the instant matter, the record is replete with uncontradicted evidence that while the Unisys trustee may have been the "legal" owner of the Executive Life contracts, the plan participants retained incidents of ownership, including control of the accounts, and were liable for both tax payments and any losses that occurred. Thus, this Court finds that the Unisys plan participants were in fact and in law the "beneficial and equitable" owners of the contracts at issue.
Turning now to this Court's interpretation of the Rhode Island Life and Health Guaranty Act, the guidelines of interpretation must first be set forth. First, and of particular significance, the Rhode Island Life and Health Insurance Guaranty Act contains a liberal construction mandate. Section 27-34.1-4 of the Act provides that "this chapter shall be liberally construed to effect the purpose... which shall constitute an aid and guide to interpretation." R.I.G.L. § 27-34.1-4. Moreover, as the Plaintiffs note, Rhode Island case law requires that in construing statutes, a meaning must be given which comports with its policies or purposes. Krikorian v. Rhode Island Dept. of Human Serv., 606 A.2d 671
(R.I. 1992). Specifically, the Krikorian court held that the purpose and intent of the legislature "are to be discerned by considering the act in its entirety and viewing it in light of the circumstances and purposes that motivated its passage." Id. at 675. Finally, as noted previously, the guaranty acts in Pennsylvania, Arizona, Indiana and Nebraska are virtually identical with the Rhode Island Act, at least with respect to provisions pertinent to the issue in the instant matter. However, absent in the foreign states' acts is any mandate to construe the language of the Act liberally in order to effect the purpose of the Act. Notwithstanding this absence, the Unisys, Honeywell, Bennett and NebraskaLife courts all found it appropriate to construe the language in such a manner as to effectuate the purpose of Act.
With the mandate of our statute, controlling Rhode Island Supreme Court case law, and the guidance of the courts of Pennsylvania, Arizona, Indiana and Nebraska, this Court finds it appropriate to liberally construe the language of the Rhode Island Act in order to effectuate its purpose. Accordingly, this Court finds that the equitable or beneficial ownership that Unisys plan participants held is sufficient to satisfy the requirements of ownership as set forth in §§ 27-34.1(a)(2)(i) and 27-34.1-5 (10) of the Rhode Island Life and Health Insurance Guaranty Act. R.I.G.L. §§ 27-34.1(a)(2)(i) and 27-34.1-5 (10). In accordance with applicable law, this Court pays homage to the purpose of the statute, to protect policy-owners, insureds, beneficiaries, annuitant payees, and assignees against losses which might otherwise occur due to an impairment or insolvency of an insurer. It appears to this Court, that there is no other rational explanation, than that the legislature intended to protect Rhode Island residents who suffered a loss as a result of the insolvency of an insurance company. Moreover, it is inconceivable to this Court that the legislature intended to protect and provide coverage to vast numbers of people from around the country who found themselves in the position of having a trustee who happens to be a resident of Rhode Island. The Rhode Island legislature could not have intended to take Californians, Floridians, and Alaskans under their wing while at the same time kicking Rhode Islanders out of the nest altogether. No such absurd result was intended by the legislature, and no such absurd intent will be implied by this Court. One legacy of the Executive Life insolvency has been the wisdom of courts around the country properly interpreting their guaranty acts to afford coverage to their respective residents under the well-recognized principles of equitable and beneficial ownership. This Court agrees and accordingly holds that RILHIGA is obligated under the Act to pay Executive Life's contractual obligations that are owed to Unisys Plan participants resident in Rhode Island who are the beneficial and equitable owners of the Executive Life contracts.
 Unallocated Annuity Contracts
In the alternative, the Defendant argues that because the contracts at issue are considered "unallocated annuity contracts", as opposed to annuity contracts that are allocated, these contracts are afforded no coverage under the Act. While the Defendant concedes that the Rhode Island Life and Health Insurance Guaranty Act that was in effect in 1991 does not refer to unallocated annuity contracts, the Defendant maintains that the Act does not contemplate or cover unallocated annuity contracts.
This Court finds this argument to be unavailing. To begin with, there is no evidence in the record that the legislature did not intend to cover unallocated annuity contracts. On the contrary, the Act was reenacted several times between its birth in 1985 and 1991, the time at issue. The legislature had every opportunity to revise the statute to exclude unallocated annuity contracts at any of those times, but did not do so. Moreover, when the statute was revised in 1995, the legislature went out of its way to specifically include unallocated annuity contracts. While the 1995 act has prospective application only,[11] it is noteworthy that the legislature made an explicit inclusion of unallocated annuity contracts only four years later. Accordingly, this Court holds that the concept of an unallocated annuity contract is not relevant to the contracts at issue in 1991Z and any related argument by the Defendant is without merit.
 Conclusion
Summary judgment will be granted when this Court finds that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Predicated upon the foregoing discussion, summary judgment shall enter in favor of Plaintiffs, and Defendant's motion for summary judgment shall be denied.
Counsel for the prevailing parties shall submit an appropriate order and judgment for entry.
[1] The Plan is the successor to the Burroughs Employees Savings Thrift Plan, The Sperry Retirement Program — Part B, and the Unisys Retirement Investment Plan II. Between the dates the Executive Life contracts at issue were purchased and the filing of the Plaintiffs' complaint, all plans were merged into the Unisys Savings Plan.
[2] The Plan is a "defined contribution" plan under Section 401(k) of the Internal Revenue Code, 26 U.S.C. § 401 (k).
[3] The four Executive Life contracts are identified as follows:
Contract No. Issue Date Maturity Date Interest
CG01238A3A 7/1/87 6/30/93 9.405% simple
CG01238B3A 7/1/87 6/30/93 9.405% simple
CG0126703A 1/5/88 9/30/92 9.75% compound
3/31/93
8/1/93
CG01279A3A 4/1/88 6/30/93 9.48% compound
Copies of the four contracts were included in Exhibits A-i through A-4 of Plaintiffs Complaint.
[4] Executive Life is an insurance company organized under the laws of the State of California, licensed to transact insurance business in Rhode Island, and with its principal place of business in Los Angeles, California.
[5] Mellon Bank replaced Northern Trust as the Plan Trustee on September 1, 1990 and was substituted for Northern Trust on the four Executive Life contracts. On January 1, 1994, CoreStates succeeded Mellon Bank as the Trustee for the four Executive Life contracts. First Union Bank, successor by merger to CoreStates, is the current Trustee. First Union Bank is a national bank with its principal place of business in Charlotte, North Carolina.
[6] "Fund Value" is defined in the contracts as the sum of all deposits less any withdrawals and scheduled payments.
[7] The statute was originally enacted in 1985 and has been reenacted several times since then. The Act in effect in 1991 applies to these claims.
[8] Defendant's Memorandum In Support of Objection to Plaintiffs' Summary Judgment Motion and In Support of RILHGA's Own Summary Judgment Motion indicates, "Although Unisys has sought summary judgment with respect to the amount of damages each participant has suffered the parties have since agreed that issue will not be presented to the Court at this time. The motions will be limited to the issue of liability." Def's Mem. of Law at 3.
[9] See L.R.C. § 72(t).
[10] Unisys also moved for summary judgment with respect to plan participants who were not residents of Pennsylvania at the time Executive Life was declared insolvent. The court denied Unisys' motion with respect to the non-residents, finding that it was not the intent of the legislature to confer benefits on nonresidents based on the residency of the trustee. Id. at 1205.
[11] "See R.I.G.L. § 27-34.3-20.